## THE SANDUSKY COUNTY Democratic Party, et al., Plaintiff

v.

## J. Kenneth BLACKWELL, Defendant

No. 3:04CV7582.

United States District Court, N.D. Ohio, Western Division.

March 3, 2005.

Fritz Byers, Toledo, OH, for Sandusky County Democratic Party.

Michael P. O'Grady, Richard M. Kerger, Kerger & Kerger, Toledo, OH, Rory P. Callahan, Cloppert Latanick Sauter & Washburn, Columbus, OH, for Ohio Democratic Party.

Joseph V. McNamara, Richard S. Walinski, Cooper & Walinski, Toldeo, OH, for Farm Labor Organizing Committee.

Joseph J. Allotta, Allotta, Farley & Widman, Toledo, OH, for North Central Ohio Building and Construction Trades Council, Local 245 International Brotherhood of Electrical Workers.

Richard G. Lillie, Benesch Friedlander Coplan & Aronoff, Cleveland, OH, for J Kenneth Blackwell, in his Official capacity as Secretary of State, Defendant.

James P. Silk, Jr., Spengler Nathanson, Theodore M. Rowen, Spengler Nathanson, Truman A. Greenwood, Spengler Nathanson, Toledo, for Gregory L. Arnold, Glenn A. Wolfe, Thomas W. Noe, Intervenors.

## ORDER

CARR, Chief Judge.

This is a § 1983 suit under the Help America Vote Act, Pub.L. 107–252, Title III, § 302, 116 Stat. 1706 (codified at 42 U.S.C. § 15301, et seq.) (HAVA). Pending is a motion by the plaintiffs for an award of attorneys' fees and costs in the amount of $64,613.14.

For the reasons that follow, the motion shall be granted.

### Background

The plaintiffs, several political and labor organizations, successfully contended that HAVA expanded the right of registered voters to cast a "provisional" ballot in federal elections. Among the statute's purposes, plaintiffs claimed, was to ensure that electors whose names were not on the registration rolls at the polling place at which they appeared or whose eligibility was challenged could vote provisionally: i.e., they could vote conditioned on a subsequent determination that they were eligible to vote. Once that determination was made, their votes would be counted.

The defendant Blackwell is Ohio's Secretary of State and thus the state's chief election official. Among his other duties, he is responsible for informing the elections officials in Ohio's eighty-eight counties about changes in the law that affect the conduct of elections for state and federal office. Although HAVA was enacted on October 29, 2002, Blackwell did not issue any regulations or directives relating to provisional voting in light of HAVA until September 16, 2004.

As issued by Blackwell, *Ohio Secretary of State Directive 2004–33* (Directive 2004–33), neither mentioned, referred to, nor discussed any of HAVA's provisions. Al-

though *Directive 2004–33* told its recipients that all "boards of elections must instruct their pollworkers on the provisional voting procedures authorized by state and federal law," the message of its text was that Ohio's County Boards of Elections could continue to implement Ohio's pre-HAVA procedures regarding provisional voting.

Plaintiffs alleged in their complaint that *Directive 2004–33* failed to inform Ohio's election officials about several substantial changes mandated by HAVA in provisional voting. They claimed that Blackwell had ignored HAVA and misinformed Ohio's elections officials.

Plaintiffs sought an injunction to compel Blackwell promptly to issue a new directive that accurately told county election boards what they had to do, and what changes they had to implement to ensure compliance with HAVA.

Blackwell opposed the motion for preliminary injunction and moved for dismissal of the complaint. He asserted that:

1) HAVA did not provide an individual right of action, and no such individual right could be asserted under § 1983;

2) Even if there was an individual right of action, plaintiffs lacked standing;

3) Plaintiffs' suit was untimely;

4) *Directive 2004–33* conformed to the requirements of HAVA; and,

5) Plaintiffs were not entitled to injunctive relief.

I concluded that HAVA created individual rights enforceable through § 1983, plaintiffs had standing to enforce those rights, and *Directive 2004–33* conflicted with HAVA. *Sandusky County Democratic Party v. Blackwell,* 339 F.Supp.2d 975 (N.D.Ohio), *aff'd in part, rev'd in part,* 387 F.3d 565 (6th Cir.2004). I also concluded

that, in view of the consideration that "the deficiencies of and defects in *Directive 2004–33* [were] many and manifest," *id.* at 994, injunctive relief to accomplish compliance with HAVA was necessary. (Doc. 26).

Accordingly, I issued a preliminary injunction on October 14, 2004. That order stated, in part, that the defendant "shall forthwith, in compliance with this Order, prepare, and, not later than 4 p.m., Monday, October 18, 2004, file with this Court a Directive that complies with the Help America Vote Act, and shall otherwise be consistent with this Order." (Doc. 26).

My order emphasized the ease with which Blackwell could comply with the command that he promptly issue a HAVA-compliant directive:

> Most of the necessary guidance that he should be providing to county election officials and precinct poll workers can be taken directly from or presented in a paraphrase of [HAVA] § 15482 [the provisional voting section], which could hardly have been drafted more clearly or succinctly. All that appears to be necessary is to recite when and for whom provisional voting is to be made available, describe the procedures for implementing HAVA, and explain the conflicts between HAVA and prior practices.

*Id.* at 997.

Blackwell did not comply with the injunction. Instead, he issued a reformulated directive which neither mentioned, discussed, or explained any of HAVA's provisions nor told Ohio's election officials how HAVA changed provisional voting in federal elections in Ohio.[1]

Rather than protecting the franchise, as HAVA intended, the proposed directive

---

**1.** The deficiencies of the Blackwell's reformulated directive were enumerated in detail in a supplemental injunction issued on October

20, 2004. *Sandusky County Democratic Party v. Blackwell,* 340 F.Supp.2d 815 (N.D.Ohio 2004).

would have exposed otherwise qualified voters to disenfranchisement. This was particularly so, because under Blackwell's reformulated directive, eligibility to vote provisionally would be "determined at the wrong time, at the wrong place, and by the wrong election official." *Sandusky County Democratic Party v. Blackwell*, 340 F.Supp.2d 815, 820 (N.D.Ohio 2004).

When I called my disappointment and concerns with Blackwell's disobedience of my original injunction to the attention of his attorneys, his lead counsel stated that Blackwell believed that he had complied with the Order and would not be filing anything further. I made clear my reluctance to issue a show cause order, and informed counsel that I would draft a HAVA-compliant directive for Blackwell to issue.

After reviewing my draft and consulting further with Blackwell, his counsel reported that the directive drafted by me was acceptable.

Blackwell appealed my injunction. He did not, however, appeal my denial of his motion for a stay of its mandate that he prepare a HAVA-compliant directive.

Rejecting Blackwell's arguments to the contrary, the Court of Appeals held that: 1) HAVA conferred rights enforceable under § 1983; 2) the plaintiffs had standing to enforce those rights, and 3) Blackwell's *Directive 2004–33* failed to comply with HAVA. That court also approved, with supplementation, the text of the directive drafted by this Court.

The Court of Appeals also reversed my decision in part, ruling that the provisional ballots of persons who voted outside the precinct in which they resided were not to be counted. I had interpreted HAVA to permit persons desiring to vote elsewhere than in the precinct of their residence to vote at any precinct in their county of residence.

In response to plaintiffs' pending petition for fees, Blackwell claims that the plaintiffs are not prevailing parties under 42 U.S.C. § 1988 because of this aspect of the Sixth Circuit's decision, which otherwise affirmed my rulings *in toto*.

Contrary to Blackwell's contention, the reversal of a portion of my decision finding that he failed to comply with federal law does not obviate the fact that he was compelled, over vigorous, indeed, at times, obdurate opposition, to comply with that law. While the Sixth Circuit held that the law did not reach as far as I understood it to reach in its efforts to protect the franchise, this litigation accomplished its main purpose, which was to ensure that the franchise-favorable and -friendly objectives of the Help America Vote Act were accomplished despite the defendant's efforts to defeat those objectives.

Because of this suit, provisional voting in Ohio in 2004 met the requirements of HAVA. Had this suit not been filed and been successful in its efforts to have Blackwell's provisional voting directives repudiated, provisional voting in Ohio would have met neither the requirements nor objectives of the statute. Moreover, by subsequently agreeing to submit to a permanent injunction, the defendant, solely as a result of this lawsuit, has been forced to ensure that those requirements and objectives will be fulfilled in future elections for federal office in Ohio. This has been accomplished, not through anything he did on his own (because neither the directive he issued nor his reformulated directive complied with HAVA), but solely as a result of this suit and this Court's orders.

### Discussion

### A. Standard For Awarding Attorneys' Fees and Costs

█ Section 1988 of the Civil Rights Acts authorizes an award of fees and costs

to parties who have prevailed· in· litigation brought under § 1983. A party prevails, for purposes of § 1988, if, because of the party's initiative, the judiciary has materially altered the legal relationship between the parties. *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't. of Health and Human Res.*, 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). A plaintiff is a prevailing party where it "has succeeded on 'any significant issue in litigation which achieve[d] some of ·the benefit the parties sought in bringing suit.' " *State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 791–92, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) (citing *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir. 1978)).

■ A party's right to recover attorney fees does not depend on the party obtaining each and every piece of the remedies it sought. The Supreme Court has explained that

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on this litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances *the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.*

*Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (emphasis supplied).

The Sixth Circuit recently summarized the test for determining whether a § 1983 litigant was a prevailing party:

> A plaintiff may be considered a prevailing party if the plaintiff "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "The touch-

stone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties," *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989), such that "the defendant's behavior [is modified] in a way that directly benefits the plaintiff," *Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). However, a "technical victory may be so insignificant...as to be insufficient to support prevailing party status." *Tex. State Teachers Ass'n*, 489 ·U.S. at 792, 109 S.Ct. 1486.

*Dillery v. City of Sandusky*, 398 F.3d 562, 569, 2005 Fed. Appx. 0079P (6th Cir.2005).

The Sixth Circuit has frequently upheld fee awards where plaintiffs have prevailed only on part of their claims. Thus, in *Berger v. City of Mayfield Heights*, 265 F.3d 399, 406 (6th Cir.2001), the court held that the plaintiff was · a prevailing party even though twelve of his fourteen claims were dismissed. In *Owner–Operator Indep. Drivers Assn., Inc. v. Bissell*, 210 F.3d 595, 597 (6th Cir.2000), the court ruled that "[a]ny enforceable judgment, or comparable type of relief, or settlement, ..., will generally.make a plaintiff a 'prevailing· party.' " The court has likewise granted prevailing party status to a plaintiff motivated by "a broader goal" beyond the specific details in the prayer for relief. *Phelan v. Bell*, 8 F.3d 369, 373 (6th Cir. 1993).

Thus, where "the case effectively revolves around one claim and a core of common facts, ... then the 'overall result' will remain the primary factor in determining counsel fees." *Lewis v. Sears Roebuck & Co.*, 845 F.2d 624, 631–632 (6th Cir.1988); *see also Cleveland Area Bd. of Realtors v. City of Euclid*, 965 F.Supp. 1017, 1020 (N.D.Ohio 1997) (holding that no reduction of fees was justified because

the alternative claims were based on the same set of facts).

The Supreme Court explained the importance of the extent to which a "plaintiff's claims for relief ...involve a common core of facts or [are] based on related legal theories." *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933. In such cases, the Court pointed out,

> [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.*

## B. The Plaintiffs, as Prevailing Parties, Are Entitled to a Full Award of Fees and Costs

■ The main issues in this case were whether the defendant had to comply with HAVA, and, if so, whether he had done so. On those principal issues, the defendant lost.

The issue which Blackwell tries *post hoc* to define as the main issue—whether HAVA allowed casting of provisional ballots at any precinct in the voter's county of residence, or only in the voter's precinct of residence—related to neither HAVA's applicability nor the defendant's compliance with the statute. The county-wide/home-precinct dispute involved an interpretation of the statute's reach; it was ancillary, not central to the basic question of whether HAVA required Blackwell to do anything.

For most of the time that this litigation was pending in this Court, Blackwell stood on two principal contentions. First, that HAVA required him to do nothing because it did not apply. Second, that he need do no more under HAVA than tell Ohio's election officials that they had to do nothing different with regard to provisional voting than they had been doing before HAVA's enactment. Blackwell maintained that position even after this Court's direct order to him to draft a HAVA-compliant directive.

Though ordered to draft a HAVA-compliant directive, Blackwell did not do so. This Court, not he, wrote the directive that the Sixth Circuit approved. The command of federal decree, and nothing else, compelled Blackwell to issue that directive.

To be sure, the relief plaintiffs sought would have been more extensive had my view of the reach of HAVA been upheld. The results obtained by the plaintiffs were, however, far from trivial or insignificant. An official who had waited nearly twenty-three months after HAVA's enactment to act, and whose action, when undertaken, failed to comply with that federal law, was compelled to issue a directive that he did not want to issue and had refused to draft even when ordered to do so. But for this suit and its success, provisional voting in Ohio would not have complied, and might never have complied with federal law.

This suit gained much more than simply "some of the benefit the parties sought." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. 1933. This suit achieved much more than a "material alteration of the legal relationship of the parties." *Tex. State Teachers Ass'n*, 489 U.S. at 792–93, 109 S.Ct. 1486. This suit did much more than modify the "defendant's behavior...in a way that directly benefit[ed] the plaintiff[s]," *Farrar*, 506 U.S. at 111–12, 113 S.Ct. 566.

The benefit of this suit extends far beyond the named plaintiffs and those whom they represented in a collective capacity: this suit benefits all of Ohio's voters who may someday want to cast a provisional

ballot, regardless of for whom they will cast that ballot.

In this regard, plaintiffs' counsel were acting less on behalf of their particular clients, who believed they had something to gain for themselves, and perhaps did, than they were working for all of Ohio's electors who desired to vote provisionally. To the extent that the defendant contends that the individual named plaintiffs did not benefit from this suit, there are two answers.

First: they appear to believe that they benefitted. Under the circumstances, that suffices.

Second, even if they did not, they, and their counsel on their behalf were acting in a well-recognized capacity: namely, as private attorneys general for the common welfare. As another district court recently stated in response to the contention that individual plaintiffs did not prevail, absent an enforceable judgment in their favor:

> This argument, however, ignores one of Congress' primary reasons for enacting § 1988. Congress specifically enacted § 1988 to encourage "private attorney generals" to further the interests of the general public. As the Supreme Court has explained:
>
> ...[W]e reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefiting [sic] only the individual plaintiffs whose rights were violated. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–55[1053–54], 55 L.Ed.2d 252 (1978). And, Congress has determined that "the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the

value of a civil rights remedy to a particular plaintiff ..." *Hensley*, 461 U.S., at 444, n. 4, 103 S.Ct. at 1945, n. 4 (BRENNAN, J., concurring in part and dissenting in part). Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards. *City of Riverside v. Rivera*, 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986). As the *Rivera* Court further explained, "... a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." *Id.* at 575, 477 U.S. 561, 106 S.Ct. at 2694, 91 L.Ed.2d 466, 106 S.Ct. 2686 (quoting *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)).

The motives of the parties in this case may have been, as defendant's opposition brief suggests, partisan. But motives in this instance do not matter: what matters is that, as a result of this litigation, every Ohio voter who wants to cast a provisional ballot can do so without the limitations that Ohio law and the defendant otherwise would have imposed on them.

For whom that ballot may be cast is immaterial: this suit ensured that the ballot would be cast, and, once cast, would be counted. This suit protected the franchise when it was at risk and preserved it when otherwise it might have been lost.

■ There is no merit, therefore, to the defendant's claim that the plaintiffs are not "prevailing parties." The only genuine question is whether the award of fees to plaintiffs should be reduced due to their failure to prevail on the county-wide/home-precinct issue. It should not.

This was a case in which, as the Supreme Court anticipated in *Hensley*, "[m]uch of counsel's time" appears to have been "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." 461 U.S. at 435, 103 S.Ct. 1933. The results accomplished substantially outweigh the failure to prevail on a single issue of statutory interpretation. It would not be appropriate to speculate about what percentage of time each attorney spent might have spent on the county-wide/home-precinct issue.

The defendant contends that "[t]he most significant portion of this litigation was over the definition of 'jurisdiction' under HAVA and what would happen to a voter's ballot if cast outside their [sic] proper precinct." (Doc. 55 at 4). That simply is not so. The county-wide/home-precinct issue was among the issues raised and considered, but it was hardly a predominant focus of either the parties' or this Court's attention.

The defendant confuses notoriety with centrality: to be sure, this Court's ruling in favor of county-wide provisional balloting gained a fair measure of notoriety. But it was not principally what this case was about, regardless of what the press may have understood. And it certainly was not a central focus of the parties' or my attention, or crucial to the resolution of the overall litigation and its impact.

No reduction will be made for the failure to accomplish everything that was sought, given the magnitude of what otherwise was gained.

## C. The Amount of Fees Requested is Reasonable.

■ In *Hensley* the Supreme Court identified twelve factors for courts to consider in assessing a reasonable fee: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id.* at 430 n. 3, 103 S.Ct. 1933.

Under *Hensley*, "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* at 433, 103 S.Ct. 1933. This method, commonly referred to as the "lodestar figure," provides an objective basis for initially estimating the value of a lawyer's services.

■ Considering the factors specified in *Hensley*, I find the amount of the requested fees to be reasonable and properly to be awarded.[2]

First ("the time and labor required"): the time and labor required were reasonable. Much of counsel's time, was devoted almost exclusively to this litigation during

2. Defendant does not contend that the time expended or hourly rates are excessive. Nor does he dispute the accuracy of plaintiffs' representation that "counsel for Plaintiffs worked together in a coordinated effort to avoid duplicating efforts and to keep costs at a minimum [and] the court will not find unnecessary duplication of efforts among counsel applying for fees." (Doc. 54 at 8.) Despite the apparent lack of dispute about the lodestar factors, I have reviewed the fee petition in light of those factors to ensure the reasonableness of the hours and rates therein reported.

its pendency generally, and especially after the plaintiffs' motion for injunctive relief became decisional. The time demands increased, rather than decreased, after I granted that relief, as a result of the defendant's failure to comply with my order to prepare a HAVA-compliant directive. Had he done so, a not inconsiderable portion of the time (and thus the fees generated thereby) would not have been expended.

In any event, the defendant's opposition brief sensibly does not try to nitpick the time sheets. If anything, the time expended on this case, as reflected in the fee petition, is understated, and perhaps significantly so.

Second ("the novelty and difficulty of the questions"): this case presented novel and difficult questions, which no court previously had addressed, at least with regard to the defendant's *Directive 2004–33*. No definitive answer existed with regard to any of the issues raised in the complaint.

Third ("the skill requisite to perform the legal service properly"): given the complexity and novelty of the issues, and the time constraints resulting from the defendant's failure to have issued *Directive 2004–33* in a more timely manner, the skill required to represent the plaintiffs, and do so successfully, was of the very highest order.

Fourth ("the preclusion of employment by the attorney due to acceptance of the case"): given the importance of the issues and the exigencies of time constraints, there can be no doubt that all counsel were largely precluded from tending to other matters and clients during the entire period of this litigation's pendency.

Fifth ("the customary fee"): having handled many § 1988 and similar fee petition cases in more than twenty-five years on the bench, I am generally familiar with the hourly fees charged by counsel of the skill and experience of the attorneys who represented the plaintiffs. The hourly rates sought here are in full accord with fees customarily charged by lawyers of equivalent skill and experience in our area.

Sixth ("whether the fee is fixed or contingent"): the fees were fixed, not contingent.

Seventh ("time limitations imposed by the client or the circumstances"): the time limitations imposed by the circumstances were extreme. Those limitations were due entirely to the defendant's delay in promulgating his original *Directive 2004–33*. Had Blackwell issued that directive in a more timely manner, instead of waiting until shortly before the November, 2004 election, those exigencies would not have existed. Blackwell's failure to comply with the injunctive order requiring him to draft a HAVA-compliant directive worsened those exigencies.

To the extent that those circumstances made counsel less efficient than otherwise they might have been, or otherwise added to the time required by this case, the fees thereby accruing are properly charged to the defendant.

Eighth ("the amount involved and the results obtained"): the "amount" involved is incalculable—what price can one put on the right to vote, and to have one's vote count, and what value can one place on securing that right when otherwise it might be lost?

The results obtained were exemplary, and of the utmost importance to the preservation of a representative democracy.

Ninth ("the experience, reputation and ability of the attorneys"): the experience, reputation, and ability of all the attorneys who represented the plaintiffs are all of the very highest.

Tenth ("the 'undesirability' of the case"): whether the case was "desirable" or not is

immaterial to consideration of the fee petition in this case.

Eleventh ("the nature and length of the professional relationship with the client"): the period and nature of the professional relationship between counsel and clients in this case are not of record. They are, in any event, immaterial.

Twelfth ("awards in similar cases"): there are, to my knowledge, as yet no cases similar to this in which fee petitions have been addressed.

I agree with plaintiffs that they are entitled to recover their costs as well as their fees. Those costs are reasonable and properly recoverable.

In light of the foregoing, I conclude that the amount of fees and costs requested on behalf of all counsel for the plaintiffs, $64,613.14, should be awarded. That being so, it is not necessary to reach the alternative grounds proposed by plaintiffs for granting the petition (this Court's inherent power or the defendant's alleged bad faith).

### Conclusion

In light of the foregoing, it is hereby

ORDERED THAT the plaintiff's motion for an award of attorneys' fees and costs be, and the same hereby is granted.

The Clerk shall enter judgment accordingly against the defendant and in favor of the plaintiffs in the amount of $64,613.14.

So ordered.